GILDEA, Chief Justice.
Appellant Miguel Angel Vasquez appeals his first-degree murder conviction. Vasquez argues that the district court committed reversible error when the court admitted into evidence testimony from his treating physicians and a burn expert. Because we conclude that any error in the admission of the challenged evidence did not substantially influence the verdict, we affirm.
*644 FACTS
Following a bench trial, the district court found Vasquez guilty of the premeditated murder of Amber Lechuga. Lechuga and Vasquez shared an apartment in Springfield. They had been romantically involved and have two children together. The State's theory was that Vasquez murdered Lechuga because their relationship had deteriorated, and she was seeing other men. The State contended that Vasquez was angry over Lechuga's decision to end their romantic relationship, and that he murdered Lechuga at their apartment and then attempted to hide her body and destroy evidence of his crimes.
Police found Lechuga's body on September 25, 2014, when they responded to Vasquez's 911 call that he had been assaulted. As they were investigating the scene near where Vasquez placed his call, police found Lechuga's body in the back of a burned-out van that Vasquez had been driving, and they found Lechuga's severed head in a black garbage bag a short distance from the van.
When officers arrived on scene in response to Vasquez's 911 call, they found Vasquez walking along the highway about two and a half miles south of Sleepy Eye. Vasquez reported that after driving south from Sleepy Eye for fifteen minutes, he was involved in a rear-end collision. He said that he got out of the van, was struck on the head and knocked out by unknown assailants, and woke up in his burning van doused in gasoline, with his clothing and the van on fire. He said he was able to call 911 because he retrieved his cellular phone from the front cup holder in the burning van.
Officers noticed that Vasquez smelled like burnt hair, the hair on his head was singed, and he had burns and scrapes on his body. Officers did not, however, observe any signs of a head injury. An emergency medical technician examined Vasquez and found some scratches, singed hair, burns, and a blister on his abdomen, but no sign of a head injury. The technician looked for soot in his mouth, nose and ears, but found none. Police also photographed Vasquez's burns, the back of his head, singed hair, and lacerations. Vasquez was then transported to Sleepy Eye Medical Center (SEMC) for treatment, and later to Hennepin County Medical Center (HCMC) for further treatment.
In addition to the physical evidence at the scene of the burned van, police also gathered evidence from the couple's apartment. Police found a sheathed knife in a backpack, a .22-caliber Marlin-brand rifle, and a machete, all in a closet. Lechuga's blood was on the front sight of the rifle, the muzzle, and just inside the barrel. DNA swabs of the grip and trigger of the rifle revealed a DNA profile that matched Vasquez, but police did not find any fingerprints on the rifle.
In the bedroom where Vasquez and Lechuga slept, police found .22-caliber ammunition with brass-plated bullets. Testimony at trial showed that the Marlin rifle was capable of firing this brass-plated ammunition. Testimony also showed that the bullet fragments recovered from Lechuga's head were brass-plated and had rifling marks consistent with a Marlin-brand rifle.
Police also found two other firearms, a Mossberg .22-caliber rifle and a shotgun in a closet. Investigators found latent fingerprints from Vasquez on the Mossberg rifle but determined that it could not have fired the fatal shots.
On the bed where Lechuga typically slept, investigators found a large, still-wet blood stain at the head of the bed. The blood was Lechuga's and the size of the blood stain was consistent with the amount *645 of blood expected from a gunshot to the head.
Investigators also found garbage bags in the apartment that were similar to the white bag found underneath Lechuga's burned torso and the black bag that contained her head. Finally, investigators found a box containing several BIC lighters.
As part of their investigation, police also interviewed Vasquez while he was hospitalized. During these interviews, Vasquez gave different accounts of the van fire. For example, Vasquez claimed that only the gasoline in the van had been on fire and not his clothing but then also said that his clothing and the van were on fire. He also told inconsistent stories about where he was in the van when he regained consciousness. And Vasquez failed to give a consistent account of how he grabbed his phone from the van-first he said he retrieved his phone by reaching into the van, and then later he said he got his phone by jumping into the driver's seat of the van.
Vasquez also gave differing accounts of the accident. Initially, he was unable to describe the car that hit him, but later he described the car as maroon or black. Vasquez's account of the assault also differed over time. He initially described being seated in his van when he was struck from behind. Later, he described being hit while walking back toward the other car.
When investigators spoke to Vasquez at the hospital, they suggested that his injuries were not consistent with his story that he woke up in a van fully engulfed in flames. Vasquez maintained that the reason for his minor injuries was that he got out quickly, removed all of his clothing, and took off running. At the end of the interview, investigators told Vasquez that they had found a body in his van and his story did not add up. Vasquez denied any knowledge of the body.
Police also asked Vasquez to sign two forms that authorized three listed law enforcement agents to access Vasquez's medical information related to the accident from both HCMC and SEMC. The forms provided that: "Unless otherwise provided by law, neither here-in named party/agency, etc. will further disclose the information without my consent." Vasquez signed the forms. He did not request to have a lawyer's advice before signing the forms, nor did Vasquez express any instructions about to whom the information should or should not be disclosed. The only request Vasquez made was for the agents to try to find whoever assaulted him.
To determine the cause of Lechuga's death, Dr. Butch Huston from the Ramsey County Medical Examiner's office performed an autopsy. He concluded that the cause of death was homicide by way of two gunshots to the head at very close range, and either gunshot would have been immediately fatal. Dr. Huston opined that the trajectory of the bullets through Lechuga's head was consistent with her lying down when she was shot. He also noted that some of Lechuga's bones had tool marks on them from being dismembered, and that those tool marks were consistent with a sharp, thin object like a knife. Finally, he recovered two bullets and several bullet fragments from within Lechuga's brain and turned them over to the BCA.
Based on the investigation, the State charged Vasquez with first-degree premeditated murder of Lechuga, Minnesota Statutes § 609.185(a)(1) (2016), second-degree intentional murder, Minnesota Statutes § 609.19, subdivision 1(1) (2016), second-degree murder while committing assault in the second degree, Minnesota Statutes, § 609.19, subdivision 2(1) (2016), and arson in the second degree, Minnesota Statutes § 609.562 (2016).
*646 Before trial, each side made motions relevant to this appeal. First, in a motion filed in April 2015, Vasquez moved to suppress statements taken at SEMC and HCMC. He argued that those statements were taken in violation of his Fifth Amendment rights based on his medical distress and the lack of a Miranda warning. Vasquez also moved to suppress his medical records on the theory that those records were illegally seized. Vasquez did not invoke his medical privilege.
The district court denied Vasquez's motion to suppress. The district court concluded that the statements taken from Vasquez did not violate Miranda . The court also concluded, based on the evidence presented at the omnibus hearing, that the "consents were given knowingly and voluntarily."
Second, in October 2016, the State moved the district court for a determination that Vasquez had waived his medical privilege, either by signing the forms or by placing his condition at issue in the case. The record does not show that Vasquez filed a response.
In support of its motion, the State argued that, by signing the forms and disclosing the information to the BCA, Vasquez effectively waived the confidentiality of the records, and thus any claim of privilege. The State also asserted that Vasquez's medical condition was at issue in the trial. The State contended that the only way for it to rebut Vasquez's account of the night of the murder was for the district court to conclude that, by putting his medical condition at issue, Vasquez waived his medical privilege.
The court then engaged in a colloquy with Vasquez's counsel:
[Counsel for Vasquez]: Judge, our position is that the waiver, if applicable at all, for the trial would only be applicable to the, the injuries that were suffered.
THE COURT: I don't-I didn't hear the State asking to go into medical records beyond the injuries that were addressed by Sleepy Eye and Hennepin County on this-the night in question; is that right?
[Counsel for the State]: Yeah, that's correct, Your Honor.
THE COURT: Okay. All right.
There was no further discussion of the medical privilege at the motion hearing, and Vasquez's counsel did not otherwise respond or try to invoke the privilege.
Four days later, the district court issued an order and memorandum granting the State's motion. The court found no dispute that Vasquez signed the forms. The court noted that Vasquez's only objection was that any waiver of privilege must be limited in scope and confined only to the dates covered by the forms, and that the State did not seek to introduce any medical information not covered by the forms. Accordingly, the court found that Vasquez partially waived his medical privilege for information covered by the forms.[1]
The case then proceeded to trial to the district court. At trial, the State offered the physical evidence described above. The State also offered evidence intended to show that Vasquez attempted to cover up his crimes. This evidence included Vasquez's effort to make it appear as though Lechuga was still alive after he had killed her. Specifically, the State offered testimony from a woman who was dating Lechuga's father. She testified that Vasquez told her that Lechuga was gone and that someone *647 must have stopped by in the night to pick her up and take her to St. James.[2] Vasquez also told the woman that he suspected that Lechuga had taken some money he had given her to pay utility bills. Vasquez then asked the woman to call Lechuga because all of his calls to Lechuga went straight to voicemail. The woman tried, but her call went straight to voicemail as well.
The State also offered testimony from Lechuga's father, who said that he received a text message purportedly from Lechuga, telling him that she had left town for a bit to clear her head. He testified that the content of the message did not seem like something she would typically send, and he had doubts that she had written it. Lechuga's sister agreed that the way the message was written was uncharacteristic of Lechuga. Other testimony showed, based on cell phone records, that this message was sent from Sleepy Eye and that Vasquez's cell phone was also present in Sleepy Eye when the message was sent. Lechuga's father sent a message back to Lechuga, asking what would happen to her children and received a response. Testimony showed that Lechuga's phone was still in Sleepy Eye when it sent a response saying that Vasquez could take the children to a friend's house.
The State also offered evidence of two text messages that Vasquez purportedly received from Lechuga later that same evening. The first asked him to pick her up in St. James. The second asked what he was driving. Vasquez responded that he would be driving the van. He then sent another message saying, "Why can't you get a ride over here you can leave but now you want me to pick you up what the f* * *[.]" Testimony at trial showed that all four messages were sent from Sleepy Eye, and that Lechuga's phone was not in St. James, which is where Vasquez had claimed that Lechuga was. Police did not find Lechuga's phone, but the State's theory was that Vasquez used Lechuga's phone to send these messages to himself.
The State also offered testimony at trial to counter the explanation Vasquez gave to police for his condition and the condition of the van when police responded to Vasquez's 911 call. A state trooper and an auto body technician testified that they did not see van damage consistent with a rear-end collision. An EMT who examined Vasquez found no signs of a head injury consistent with being knocked out. Two other law enforcement agents were similarly unable to find any sign of a head injury consistent with being struck on the head. A deputy state fire marshal testified that a person exposed to gasoline flames would be immediately burned. He opined that a cellular phone exposed to those temperatures would likely be partially melted and he observed no melting on Vasquez's phone. The fire marshal also testified that it was impossible to reach the cup holder from which Vasquez claimed to have grabbed his cell phone through the open window. A law enforcement officer testified that a person waking up in a burning vehicle would suffer burns over the whole body rather than the localized burns that Vasquez sustained. And there was testimony from law enforcement officers and the fire marshal that Vasquez's burns appeared to be caused by "blow back fire," which occurs when gasoline vapors are lit.
The State also offered the testimony of Vasquez's treating physicians and a burn expert. The physicians testified that they *648 found only first and second-degree burns on Vasquez, along with some singed hair and the smell of gasoline about his person-injuries consistent with a flash burn, and inconsistent with the account Vasquez gave to police.
Vasquez's physicians noted a lack of third and fourth-degree burns to his body and in particular his hands. They testified that those injuries would be expected where a person was set on fire or removed burning clothing. Also absent were evidence of a head injury and signs of a smoke inhalation injury, the latter of which would be expected if Vasquez was unconscious in a fire.
The State did not offer Vasquez's medical records into evidence, but the State did ask a burn expert to review those records before trial. This expert consulted medical records from SEMC and HCMC, as well as photographs police took at the scene and law enforcement reports. The expert testified that Vasquez's injuries were inconsistent with the account that Vasquez gave to police and the relative lack of injury to his left side further discredited his account of the fire. He opined that Vasquez should have had some degree of smoke inhalation injury and multiple third-degree burns. He also testified, based on photographs shown to him at trial, that Vasquez's nearly uniform first-degree burn was more consistent with a flash burn, caused by a sudden burst of flame, than with the story Vasquez told police.
The expert further opined that if Vasquez had grabbed his cell phone from the burning van, as Vasquez claimed, Vasquez would have suffered third-degree burns to his hand, but Vasquez had no such injury. He also opined that Vasquez's injuries were consistent with a right-handed person, such as Vasquez, lighting gasoline fumes with a lighter.
At the conclusion of the trial, the district court made findings of fact and conclusions of law and found Vasquez guilty of all four charges. The court found that the evidence established that Vasquez's "story of being rear-ended by another vehicle was demonstrably false." On the first-degree premeditated murder count, which is the only charge relevant to this appeal, the court found that Vasquez's actions in retrieving a firearm and loading, aiming, and firing it demonstrated premeditation. The court also found evidence of premeditation in Vasquez's elaborate efforts to conceal his crime. The court sentenced Vasquez to life in prison without the possibility of release. This appeal follows.
ANALYSIS
On appeal, Vasquez argues that the district court erred by admitting privileged medical information into evidence. Specifically, Vasquez argues that the admission of information from his medical records[3] and the testimony from his treating physicians, was erroneous. He contends that this evidence was prejudicial because the only factual information about the nature of his injuries in the district court's findings of fact came from Vasquez's treating physicians.
We review a district court's decision to admit evidence for an abuse of discretion. State v. Griffin , 887 N.W.2d 257, 261 (Minn. 2016). A court abuses its discretion when it reaches a " 'clearly erroneous conclusion that is against logic and the facts on record.' "
*649 State v. Williams , 842 N.W.2d 308, 313 (Minn. 2014) (quoting Moylan v. Moylan , 384 N.W.2d 859, 864 (Minn. 1986) ). Before turning to the merits of the evidentiary issue that Vasquez raises, we must determine whether, as the State argues, Vasquez has waived review of this issue.[4]
I.
We have recognized that a " 'constitutional right, or a right of any other sort, may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' " State v. Beaulieu , 859 N.W.2d 275, 278 (Minn. 2015) (alteration in original) (quoting United States v. Olano , 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ). Appellate review of an evidentiary issue is forfeited when a defendant fails to object to the admission of evidence. State v. Vick , 632 N.W.2d 676, 684 (Minn. 2001).[5] A defendant may preserve a claim of evidentiary error by making a pretrial motion to exclude the challenged evidence or by objecting at trial when the evidence is introduced. State v. Litzau , 650 N.W.2d 177, 183 (Minn. 2002). A defendant's objection to the admission of evidence preserves review only for the stated basis for the objection or a basis apparent from the context of the objection. State v. Rossberg , 851 N.W.2d 609, 617-18 (Minn. 2014).
Here, Vasquez did not move to suppress medical information on the basis that the medical privilege applied. He moved to suppress his medical information on only a theory of defective consent. The district court denied Vasquez's motion. Vasquez does not appeal this ruling.
This appeal instead relates to the subject of the State's pretrial motion. Before trial, the State moved for a determination that Vasquez had waived his medical privilege. At the hearing on the State's motion, Vasquez did not contest the introduction of evidence about his treatment during the period covered by the forms he signed or offer any other objection to the admission of that information. Vasquez expressed concern only about the introduction of medical information that was not covered by the form: "Judge, our position is that the waiver, if applicable at all, for the trial would only be applicable to the, the injuries that were suffered."
In response to Vasquez's position, the district court confirmed that the State had no intention of introducing records or testimony that were not covered by the form: "I don't-I didn't hear the State asking to go into medical records beyond the injuries that were addressed by Sleepy Eye and Hennepin County on this-the night in question; is that right?" The State confirmed that intention: "Yeah, that's correct, Your Honor." Vasquez's counsel made no further comments or other objection. The district court then ruled that Vasquez waived his privilege for the medical information covered by the forms. At trial, Vasquez did not object to the introduction of medical information on the basis of privilege or coerced consent.
*650 The medical evidence that Vasquez challenges on appeal falls within the scope of the forms that Vasquez signed. Because Vasquez did not make a timely claim of privilege in the district court to prevent the introduction of this evidence, we conclude that he has forfeited review of the district court's determination that he waived his medical privilege as to that evidence.
II.
Our conclusion that Vasquez forfeited review of the admission of the medical information is not the end of the analysis. This is so because we review forfeited issues for plain error. Minn. R. Crim. P. 31.02 ; Beaulieu , 859 N.W.2d at 279. A defendant is entitled to relief from a plain error if "(1) there was an error, (2) the error was plain, and (3) the error affected the defendant's substantial rights." State v. Myhre , 875 N.W.2d 799, 804 (Minn. 2016) (citing State v. Griller , 583 N.W.2d 736, 740 (Minn. 1998) ). If the three prongs of the plain error test are met, we then consider " 'whether [we] should address the error to ensure fairness and the integrity of the judicial proceedings.' " Id. at 804-05 (alteration in original) (quoting Griller , 583 N.W.2d at 740 ).
We need not determine in this case if the district court's admission of the medical information was error that was plain because even if it was plain error, Vasquez has not demonstrated that the admission of the challenged evidence affected his substantial rights. Erroneously introduced evidence affects the defendant's substantial rights if it significantly influences the verdict by going to a critical issue at the trial or is central to the prosecution's case. Rossberg , 851 N.W.2d at 618 ; Litzau , 650 N.W.2d at 184.
Vasquez argues that the medical information significantly affected the verdict because the district court's findings of fact relied on medical information for the conclusion that Vasquez's story to police was "demonstrably false." The court did rely on testimony from Vasquez's medical providers when discussing the nature of injuries Vasquez suffered as compared to the injuries one would expect if the accident had occurred as Vasquez contended it had to police. But the court also specifically concluded that "the physical evidence contradicts the Defendant's story," referencing the fact that "[t]here was no damage to the van caused by [the] alleged high-speed collision."
Contrary to Vasquez's argument, our careful consideration of the record convinces us that the medical evidence Vasquez challenges did not substantially influence the verdict. The medical evidence was largely cumulative of other evidence. The State used the medical information to confirm the falsity of the story that Vasquez told police. Specifically, the State relied on testimony from Vasquez's physician to establish that Vasquez's account of an accident and assault did not align with the injuries that he actually sustained. But testimony from law enforcement officers, a deputy State fire marshal, an auto body technician, as well as an EMT also support the conclusion that the injuries they observed and the condition of the van were inconsistent with Vasquez's story.
Moreover, the challenged evidence was a small part of the State's case, and the other evidence that Vasquez murdered Lechuga in their apartment, dismembered her body and then attempted to destroy the evidence of his crime is strong. See, e.g. , State v. Jackson , 770 N.W.2d 470, 483 (Minn. 2009) (concluding that erroneous admission of evidence did not substantially influence the verdict because the erroneously-admitted evidence was cumulative to other evidence and there was "strong evidence"
*651 of the defendant's guilt). Vasquez's own account of the accident ties him to the van, where police found Lechuga's body. Physical evidence police found in the apartment Vasquez shared with Lechuga ties him to the murder and the disposal of the body in the van. Vasquez's DNA and Lechuga's blood were found on the murder weapon-the Marlin rifle. The bullet fragments found in Lechuga's skull were consistent with ammunition found in Vasquez's apartment and had rifling marks on them consistent with the Marlin rifle. A blood stain found in Vasquez's apartment was consistent with the amount of blood expected from a gunshot wound to the head and matched Lechuga's DNA. The garbage bags found at Vasquez's apartment were also similar to those found with Lechuga's body and severed head.
In addition, the evidence of premeditation was strong. Evidence regarding motive is relevant to premeditation. See State v. Hurd , 819 N.W.2d 591, 600 (Minn. 2012) ("[I]f motive is present, 'it can help strengthen a finding that the defendant deliberated about the killing.' " (quoting State v. Anderson , 789 N.W.2d 227, 242 (Minn. 2010) ) ). Here, the State demonstrated that Vasquez was angry because Lechuga decided to end their romantic relationship, providing a motive to kill. See State v. Moore , 846 N.W.2d 83, 89 (Minn. 2014) ("The anger sparked by the deterioration of the couple's relationship and [the defendant]'s jealousy provided a motive to kill, which supports the Jury's premeditation determination."). In assessing premeditation, we also examine the nature of the killing. See State v. Vang , 774 N.W.2d 566, 583 (Minn. 2009) (recognizing that the nature of the killing is relevant to an inference of premeditation). As the medical examiner explained, Lechuga was killed when she was shot in the head at close range, while she was lying down in her bed. See State v. Cox , 884 N.W.2d 400, 413 (Minn. 2016) ("[E]vidence showing that the defendant inflicted wounds to the victim's vital organs may support an inference of premeditation."). To commit the murder, Vasquez had to collect the Marlin rifle from the front closet, load it, go to the bedroom where Lechuga was lying, aim the rifle at her head, and then fire it twice. See State v. Hughes , 749 N.W.2d 307, 313 (Minn. 2008) ("We have recognized in several cases that procurement of a weapon constitutes evidence of premeditation."); Bangert v. State , 282 N.W.2d 540, 544 (Minn. 1979) (concluding that the jury's finding of premeditation was reasonable where defendant retrieved a rifle, walked to the bedroom, raised the rifle, aimed the rifle, and fired the rifle three times). Finally, Vasquez's efforts to convince Lechuga's family that she had left town are relevant to premeditation, as are his dismembering of Lechuga's body and his attempt to dispose of the body by setting the van on fire. See State v. Ortega , 813 N.W.2d 86, 101 (Minn. 2012) (concluding that cleaning up and disposing of evidence were efforts to evade detection and supported a finding of premeditation); State v. Leake , 699 N.W.2d 312, 321 (Minn. 2005) (concluding that burning evidence supported finding of premeditation); State v. Lodermeier , 539 N.W.2d 396, 398 (Minn. 1995) (noting that a defendant's "words and actions before, during and after the killing" can support an inference of premeditation).
Because the medical evidence was not central to the case, it was duplicative of other testimony, and the evidence of Vasquez's guilt was otherwise strong, we conclude that the admission of the medical evidence did not substantially influence the verdict. Accordingly, even if the district court plainly erred by admitting the medical evidence, we hold that Vasquez is not entitled to relief under the plain error standard.
*652 CONCLUSION
For the foregoing reasons, we affirm the district court.
Affirmed.
THISSEN, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

The district court's finding of waiver was based solely on Vasquez signing the forms. The court did not address the State's argument that Vasquez waived his medical privilege by placing his medical condition at issue. Because the district court did not reach this alternative basis, we do not consider this theory further.

St. James is approximately 40 miles southeast of Springfield and 25 miles south of Sleepy Eye.

The State did not offer Vasquez's medical records into evidence. But Vasquez argues that the testimony of his treating physicians and the testimony of the State's burn expert was based in part on those witnesses' review of his medical records, records that Vasquez contends his medical privilege protects.

The State characterizes the issue as one of waiver rather than forfeiture. "Waiver" is the intentional relinquishment of a known right. See, e.g. , State v. Beaulieu , 859 N.W.2d 275, 278 n.3 (2015). "Forfeiture," on the other hand is the failure to make a timely assertion of a right. Id.

Our prior cases have often used the word "waived" when describing a defendant's failure to make a timely objection to an evidentiary error in the trial court. See State v. Vick , 632 N.W.2d 676, 684 (Minn. 2001). The more appropriate characterization of that failure to timely object is as a forfeiture. See Beaulieu , 859 N.W.2d at 278 n.3.