PETERSON, Judge*
These consolidated appeals arise from convictions of second- and third-degree assault and the sentence imposed for second-degree assault. Respondent/appellant Casey Daniel Bauer challenges the convictions, arguing that the district court erred in (1) failing to instruct the jury on the statutory definition of "great bodily harm" and (2) entering a judgment of conviction for third-degree assault. Appellant/respondent State of Minnesota challenges the sentence imposed for second-degree assault, arguing that the district court abused its discretion when it granted a downward dispositional departure. We affirm in part, reverse in part, and remand.
FACTS
J.F. was in his garage opening the rear door of his car when he heard footsteps behind him. As he turned to look, he realized that he was being struck by something. He was hit twice on the side of his head and then on the side of an ear. J.F. turned around and saw a person wearing a mask.
The person in the mask tripped over a bicycle and fell on top of J.F., who had fallen to the floor on his back. The two struggled, and J.F. was able to get the mask off the person, whom J.F. recognized as respondent/appellant Casey Daniel Bauer. Bauer threatened J.F. and, among other things, said, "You're going to die." J.F. feared that Bauer would harm him, and he struggled to get out from under Bauer. J.F. had a folding knife clipped to his right side pocket. He opened the knife, pushed upward with it, and struck Bauer four or five times.
The struggle continued until a neighbor peeked into the garage, and J.F. said to her, "Help me. He's trying to kill me." The neighbor saw J.F. lying on the floor and a person standing over him. She left and went as fast as she could to her apartment to call for help. When she got to her apartment, she heard a noise behind her. She turned and saw J.F. She helped him get into her apartment, called 911, and tended to his injuries. She described J.F. as "unsteady," with blood "kind of running *51 in different areas down his face" and with "swelling in a couple of areas on his head."
J.F. was taken to a hospital emergency room, and the doctor who examined him testified that J.F. was talking fast, but he was coherent, and his injuries were not life threatening. The doctor did not find any bruising and did not see any signs of fractures of J.F.'s arms or legs. There were two cuts on the top of J.F.'s head. J.F. told the doctor that he was assaulted with a baseball bat[1] and that he was hit with the bat in the head, neck, chest, and abdomen. The doctor testified that J.F.'s statement was consistent with the injuries that he observed. The doctor explained that "a blunt object like a bat with enough force could cause what we call a 'burst laceration.' That's where the-when the skin and tissues are impacted hard enough they will literally just split apart like, you know, as a laceration."
Bauer was charged with second-degree assault (dangerous weapon-substantial bodily harm), in violation of Minn. Stat. § 609.222, subd. 2 (2014), third-degree assault (substantial bodily harm), in violation of Minn. Stat. § 609.223, subd. 1 (2014), and threats of violence (intent to terrorize), in violation of Minn. Stat. § 609.713, subd. 1 (2014).
At trial, Bauer claimed that he went to J.F.'s home to talk to him, and J.F. initiated the physical altercation by stabbing him twice "before [Bauer] could even do anything." Bauer argued to the jury that he hit J.F. purely in self-defense.
Before giving the case to the jury, the district court heard requests from both parties about what the jury instructions should include. Neither the state nor Bauer argued that the jury should be instructed on the statutory definition of "great bodily harm," and the jury instructions did not define "great bodily harm." The jury found Bauer guilty on both assault counts and not guilty on the threats-of-violence count. The district court entered convictions for both assault counts.
The district court initially denied Bauer's request to be released pending sentencing. However, after Bauer made a second request, the district court granted him a 72-hour furlough from jail because Bauer's mother had late-stage terminal cancer. Bauer was released on April 3, 2018, and was required to return on April 6, 2018, but he failed to return as required, and a warrant was issued for his arrest. Police arrested Bauer on April 12, 2018. Bauer explained that he did not return to jail as required because his mother died on April 5, and her funeral was scheduled for April 12.
At sentencing, all parties recognized that third-degree assault (substantial bodily harm) is a lesser-included offense of second-degree assault (dangerous weapon-substantial bodily harm). However, the transcript indicates that the parties believed that it was appropriate for Bauer to be convicted of both counts, as long as he was sentenced for only the more serious count.
The presumptive sentence for Bauer's second-degree-assault conviction was 27 months, executed, with a sentence ranging between 23 and 32 months. Bauer moved for a downward dispositional departure, asking that he receive probation instead of an executed sentence, so that he could attend the Minnesota Adult and Teen Challenge Program, a 13- to 15-month program *52 that would help Bauer address his mental-health and chemical-dependency issues. Over the state's objection, the district court granted Bauer's motion on the condition that Bauer successfully complete the long-term Minnesota Adult and Teen Challenge Program. The district court found that Bauer was particularly amenable to probation because he was willing to spend a significant period of time in treatment to address significant chemical-dependency and mental-health issues. The district court imposed a stayed 32-month sentence and placed Bauer on probation for seven years. In addition to requiring Bauer to complete treatment, the district court imposed various other restrictions. These cross-appeals follow.
DECISION
I. Failure to instruct on definition of "great bodily harm"
Bauer argues that the district court plainly erred when it did not include the statutory definition of "great bodily harm" in the jury instructions for the second-degree-assault charge. Bauer concedes that he did not object to the jury instructions at trial. "A defendant generally forfeits the right to contest jury instructions on appeal when the defendant fails to object at trial." State v. Davis , 864 N.W.2d 171, 176 (Minn. 2015). This court, however, will consider an issue not raised before the district court if it constitutes plain error. State v. Taylor , 869 N.W.2d 1, 15 (Minn. 2015).
"A defendant is entitled to relief from a plain error if (1) there was an error, (2) the error was plain, and (3) the error affected the defendant's substantial rights." State v. Vasquez , 912 N.W.2d 642, 650 (Minn. 2018) (quotation omitted). If each prong of the plain-error test is met, this court then "consider[s] whether [it] should address the error to ensure fairness and the integrity of the judicial proceedings." Id. (quotations omitted). If an appellate court concludes that any requirement of the plain-error test is not satisfied, the appellate court need not consider the other requirements. State v. Brown , 815 N.W.2d 609, 620 (Minn. 2012).
(a) There was an error
An appellate court "review[s] the jury instructions as a whole to determine whether the instructions accurately state the law in a manner that can be understood by the jury." State v. Kelley , 855 N.W.2d 269, 274 (Minn. 2014). "[T]he elements of the crime should be explained, but detailed definitions of the elements to the crime need not be given in the jury instructions if the instructions do not mislead the jury or allow it to speculate over the meaning of the elements." Peterson v. State , 282 N.W.2d 878, 881 (Minn. 1979).
The second-degree-assault statute states: "Whoever assaults another with a dangerous weapon and inflicts substantial bodily harm may be sentenced to imprisonment for not more than ten years or to payment of a fine of not more than $20,000, or both." Minn. Stat. § 609.222, subd. 2 (emphasis added). Consistent with this statute, the district court instructed the jury that "under Minnesota law whoever assaults another with a dangerous weapon and inflicts substantial bodily harm is guilty of a crime." Thus, to find Bauer guilty of second-degree assault, the jury needed to determine whether the bat he used during the assault was a dangerous weapon and whether the injuries he inflicted constituted substantial bodily harm.
"Dangerous weapon" and "substantial *53 bodily harm"[2] are terms defined by statutes.
"Dangerous weapon" means any firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or great bodily harm, any combustible or flammable liquid or other device or instrumentality that, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm , or any fire that is used to produce death or great bodily harm.
Minn. Stat. § 609.02, subd. 6 (2014) (emphasis added).
The district court instructed the jury that "[a] dangerous weapon is anything designed as a weapon and capable of producing death or great bodily harm, or anything else that in the manner it is used or intended to be used is known to be capable of producing death or great bodily harm. " (emphasis added). This instruction was taken from 10 Minnesota Practice , CRIMJIG 13.10 (2015) and modified only to omit a reference to "any combustible or flammable liquid."
The committee that drafted CRIMJIG 13.10 explained:
The definition of dangerous weapon in CRIMJIG 13.10 is different from M.S.A. § 609.02, subd. 6. The language of CRIMJIG 13.10 originally duplicated the language of the statute. However, the definition was challenged for being unconstitutionally vague. See State v. Jensen , 373 N.W.2d 364 (Minn. App. 1985) ; State v. Graham , 366 N.W.2d 335 (Minn. App. 1985). The Court of Appeals expressed concern that the statute's use of the term "likely" could be interpreted to improperly dilute the State's burden of proof. CRIMJIG 13.10 was amended, and its language changed to clarify the State's burden of proof. The Court noted with approval the model penal code definition of "deadly weapon," and the Committee has therefore modified the definition of dangerous weapon to conform to these holdings of the Court of Appeals. See State v. Gebremariam , 590 N.W. 2d 781 (Minn. 1999).[3]
10 Minnesota Practice , CRIMJIG 13.10.
Thus, under the district court's instructions, to determine whether the bat was a dangerous weapon, the jury needed to determine whether the bat was used in a manner that was known to be capable of producing death or great bodily harm.[4] Because a device can be a dangerous weapon if it is capable of producing either death or great bodily harm, a jury could determine that a device is not capable of producing death but still conclude that the device is a dangerous weapon because it is capable of producing great bodily harm. "Great bodily harm," however, is a statutorily defined term. Therefore, in order to conclude that the bat was a dangerous weapon without speculating over the meaning of the elements of second-degree *54 assault, the jurors would need to know the statutory definition of great bodily harm.
Under the statute, " '[G]reat bodily harm' means bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily harm." Minn. Stat. § 609.02, subd. 8 (2014). The jury instructions did not include the statutory definition of great bodily harm. Instead, the district court instructed the jury that if the court had not defined a word or phrase, the jury "should apply the common, ordinary meaning of that word or phrase."
The common, ordinary meaning of great is "[l]arger in size than others of the same kind" or "[r]emarkable or outstanding in magnitude, degree, or extent." The American Dictionary of the English Language 792 (3d ed. 1992). Under this meaning, "great bodily harm" would be harm that is worse than other bodily harm in degree or extent. But, unlike the statutory definition of "great bodily harm," which emphasizes permanent or protracted injury or impairment, this common meaning does not identify a degree or extent of harm at which bodily harm becomes great bodily harm. Thus, the common, ordinary meaning of "great bodily harm" differs from the meaning of the statutory definition, and the jury instructions did not explain the elements of second-degree assault. The failure to instruct on the statutory meaning was error.
(b) The error was plain
"An error is plain if it is clear or obvious, which is typically established if the error contravenes case law, a rule, or a standard of conduct." State v. Webster , 894 N.W.2d 782, 787 (Minn. 2017) (quotation omitted). This court has held that, in a trial on a charge of third-degree criminal sexual conduct, in violation of Minn. Stat. § 609.344, subd. 1(c)(2010), the district court erred by not including the statutory definition of "force" in the jury instruction on third-degree criminal sexual conduct because
a jury applying the common understanding of the word "force" to the elements of third-degree criminal sexual conduct could find a defendant guilty of the offense merely by concluding that he exerted "strength," "energy," or "power" against a victim, without any actual, attempted, or threatened infliction of bodily harm, as required by the legislature [in the statutory definition of "force"]. Such an outcome would be inconsistent with a defendant's right to "a jury determination that he is guilty of every element of the crime with which he is charged."
State v. Moore , 863 N.W.2d 111, 121-22 (Minn. App. 2015) (quoting State v. Caldwell , 803 N.W.2d 373, 384 (Minn. 2011) ), review denied (Minn. July 21, 2015).
In Moore , this court determined that the jury instruction did not misstate the elements of the charged offense, but, without the statutory definition of "force," which was an element of the offense, the instruction was erroneous because it "failed to include details that are necessary to fully explain the applicable law." Id. at 122. Similarly, here, the statutory definition of great bodily harm includes details that were necessary to fully explain the applicable law to the jury. Without the statutory definition, the jury had no basis for determining the point at which bodily harm becomes great bodily harm under the statute, or even for determining whether great bodily harm means something different from substantial bodily harm. Thus, omitting the definition of great bodily harm from the instructions was contrary to the rule set forth in Moore and was, therefore, *55 plain error. See LaMere v. State , 278 N.W.2d 552, 557 (Minn. 1979) (when defendant did not admit that inoperable gun was a dangerous weapon, jury instructions should have explained that firearm that is unloaded or inoperable when used may still be a firearm).
(c) The error did not affect Bauer's substantial rights
"An erroneous jury instruction affects a defendant's substantial rights if the error was prejudicial and affected the outcome of the case." State v. Huber , 877 N.W.2d 519, 525 (Minn. 2016). "An error in instructing the jury is prejudicial if there is a reasonable likelihood that giving the instruction in question had a significant effect on the jury's verdict." Id. (quotation omitted). The defendant must prove prejudice, which is "a heavy burden." Id.
Bauer argues that the lack of an instruction about the definition of great bodily harm affected his substantial rights because (1) the jury was permitted to find him guilty of second-degree assault "even if it found that the small bat was capable of causing a lesser level of harm than ... great bodily harm requires"; and (2) whether the bat was capable of causing great bodily harm was a contested element at trial.
Without knowing the statutory definition of great bodily harm, the jury could have found Bauer guilty of second-degree assault even if it found that the bat Bauer used was capable of producing only bodily harm less serious than the statute requires. But, we must consider this possibility in light of the evidence about the manner in which the bat was used. Bauer used the bat to hit J.F. in the head at least three times, and the doctor who treated J.F. testified that the bat hit J.F. with sufficient force to cause the skin and tissue to split apart. Given this evidence, which is sufficient to show that the bat was used in a manner that was capable of killing J.F., there is not a reasonable likelihood that failing to instruct the jury about the definition of great bodily harm had a significant effect on the jury's verdict. We, therefore, conclude that, although the failure to instruct was a plain error, the error did not affect Bauer's substantial rights.
II. Downward dispositional departure
The Minnesota Sentencing Guidelines prescribe a range of sentences for an offense that are "presumed to be appropriate." Minn. Sent. Guidelines 2.D.1 (2014). A sentencing court "must pronounce a sentence within the applicable range unless there exist identifiable, substantial, and compelling circumstances" that distinguish a case and overcome the presumption in favor of a guidelines sentence. Id. ; see also State v. Soto , 855 N.W.2d 303, 308 (Minn. 2014) (noting that a sentencing court can exercise discretion to depart from guidelines only if aggravating or mitigating circumstances are present and those circumstances provide substantial and compelling reason not to impose guidelines sentence).
The sentencing guidelines contain a nonexclusive list of factors that may be used as reasons for a departure. Minn. Sent. Guidelines 2.D.3 (2014). One mitigating factor included in this list is that "[t]he offender is particularly amenable to probation." Minn. Sent. Guidelines 2.D.3.2. (7) (Supp. 2015). The guidelines state that "[t]his factor may, but need not, be supported by the fact that the offender is particularly amenable to a relevant program of individualized treatment in a probationary setting." Id. Dispositional departures are based on offender-related factors, such as particular amenability or unamenability to probation. See State v. Trog , 323 N.W.2d 28, 31 (Minn. 1982) (listing factors courts may consider when *56 determining whether defendant is particularly amenable to probation, including defendant's age, prior record, remorse, cooperation, attitude in court, and support of family and friends); see also State v. Heywood , 338 N.W.2d 243, 244 (Minn. 1983) (stating that in considering dispositional departure, this court's focus is on defendant as an individual and whether presumptive sentence is best for defendant and for society).
The state argues that the district court erred in granting Bauer's motion for a downward dispositional departure because: (1) the reasons given by the district court did not support a downward dispositional departure; and (2) the district court failed to consider the circumstances "for and against departure." The state also analyzes the Trog factors, and argues that they do not support the district court's ruling.
"We review a district court's decision to depart from the presumptive guidelines sentence for an abuse of discretion." State v. Solberg , 882 N.W.2d 618, 623 (Minn. 2016). "A district court abuses its discretion when its reasons for departure are legally impermissible and insufficient evidence in the record justifies the departure." Id.
The district court granted Bauer a downward dispositional departure based primarily on its determination that Bauer is particularly amenable to probation. In its on-the-record consideration of Bauer's departure motion, the district court heavily relied on the fact that Bauer took the initiative to get assessed and conditionally accepted by the long-term Minnesota Adult and Teen Challenge Program, which the discussion on the record shows is a 13- to 15-month program that helps individuals address mental-health and chemical-dependency issues and build life skills.
Because the sentencing guidelines explicitly recognize that a permissible reason for a downward departure is that an offender "is particularly amenable to probation," the state's argument is essentially that the district court abused its discretion when it determined that Bauer's initiative in getting assessed and conditionally accepted by a relevant treatment program made him particularly amenable to probation. The state cites no authority that supports its argument that these facts are insufficient to allow a district court to determine that a defendant is particularly amenable to probation. Accordingly, this argument fails.
The state next argues that the district court's reasoning was insufficient because the district court failed to adequately consider the circumstances for and against departing. But the record shows that the district court did consider circumstances for and against departing. When the state argued that Bauer's failure to return to jail as required shows that Bauer is not amenable to probation, the district court responded,
But in fairness to Mr. Bauer, his mother was dying of cancer. And if you could think of a situation that would mitigate your failure to return to jail, if you tried to think of the best circumstances, I suspect that's one of the best things you could come up with.
Yes, [Bauer] didn't obey my order, and part of me says, "Well, yeah, I should hold that against [Bauer]." But it's difficult under those circumstances to hold that against [Bauer].
There is no requirement that the district court must expressly consider all Trog factors in determining that "substantial and compelling circumstances" exist, or that a defendant is "particularly amenable to probation." See State v. Pegel , 795 N.W.2d 251, 254 (Minn. App. 2011). Therefore this argument also fails. Because the district *57 court's decision to depart was within its discretion, there is no need for this court to independently analyze the Trog factors, and we affirm the district court's order granting appellant's motion for a downward dispositional departure.
III. Entering judgment of conviction of third-degree assault
The district court entered a judgment of conviction for both second-degree assault and third-degree assault. In Minnesota, "[u]pon prosecution for a crime, the actor may be convicted of either the crime charged or an included offense, but not both. An included offense may be ... [a] lesser degree of the same crime." Minn. Stat. § 609.04, subd. 1 (2014). An offender does not forfeit "claims of multiple convictions or sentences by failing to raise the issue at the time of sentencing." Spann v. State , 740 N.W.2d 570, 573 (Minn. 2007). Whether a conviction is for an included offense is a question of law that this court reviews de novo. State v. Cox , 820 N.W.2d 540, 552 (Minn. 2012).
The transcript indicates that the parties incorrectly believed that, as long as Bauer was sentenced for only the more serious offense, he could be convicted of both second and third-degree assault. But Minn. Stat. § 609.04, subd. 1, does not allow district courts to enter a conviction for an included offense. State v. Pflepsen , 590 N.W.2d 759, 765 (Minn. 1999). Instead, courts are to adjudicate guilt and sentence for one count only. Id. at 765-66.
We conclude, and the parties agree, that third-degree assault is an included offense of second-degree assault and that Bauer's third-degree-assault conviction should be vacated. We, therefore, reverse the conviction and remand so that the district court can vacate the conviction.
Affirmed in part, reversed in part, and remanded .

Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

The parties dispute the size of the bat. Bauer contends that it was a "small, wooden baseball bat," and the state describes it as a "baseball bat." The record does not clearly reveal the size of the bat, but it appears that it was not a full-size bat that an adult would use in a baseball game.

" 'Substantial bodily harm' means bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily member or organ, or which causes a fracture of any bodily member." Minn. Stat. § 609.02, subd. 7a (2014). The jury instructions directly reflected the statutory definition of "substantial bodily harm."

Bauer challenges only the district court's failure to include a definition of "great bodily harm" in the jury instructions; he does not challenge the language in CRIMJIG 13.10.

We take judicial notice that a baseball bat is not designed as a weapon. See State v. Pierson , 368 N.W.2d 427, 434 (Minn. App. 1985) (stating that "[j]udicial notice of adjudicative facts is normally limited to facts of common knowledge not in dispute, and those for which neither expertise nor foundation is needed").