*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A25-1477**

State of Minnesota,
Respondent,

vs.

Adam Hassan Yusuf,
Appellant.

**Filed June 22, 2026**
**Affirmed**
**Cleary, Judge**[*]

Stearns County District Court
File No. 73-CR-25-495

Keith Ellison, Attorney General, Lydia Villalva Lijó, Assistant Attorney General, St. Paul, Minnesota; and

Janelle Kendall, Stearns County Attorney, St. Cloud, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Rebecca Ireland, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Worke, Presiding Judge; Connolly, Judge; and Cleary, Judge.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**CLEARY**, Judge

In this direct appeal from a final judgment convicting appellant of first-degree robbery, unlawful possession of a firearm, and second-degree assault, appellant argues that the district court erred (1) by failing to provide a cautionary instruction when *Spreigl* evidence[1] was received and (2) by admitting the *Spreigl* evidence without proper authentication. Because we conclude that the district court did not commit reversible error, we affirm.

**FACTS**

Respondent State of Minnesota charged appellant Adam Hassan Yusuf with first-degree robbery in violation of Minnesota Statutes section 609.245, subdivision 1 (2024), unlawful possession of a firearm in violation of Minnesota Statutes section 624.713, subdivision 1(2) (2024), and second-degree assault in violation of Minnesota Statutes section 609.222, subdivision 1 (2024). These charges relate to allegations that Yusuf robbed S.A. at gunpoint on January 16, 2025. The matter proceeded to a two-day jury trial at which S.A. testified along with several other witnesses, including law enforcement officers, a crime intelligence analyst, and an investigator. In addition, the district court

---

[1] Minnesota Rule of Evidence 404(b)(1) provides: "Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith." But such evidence may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Minn. R. Evid. 404(b)(1). Evidence offered for one of these other purposes is called *Spreigl* evidence. *State v. McLeod*, 705 N.W.2d 776, 780 n.1 (Minn. 2005) (citing *State v. Spreigl*, 139 N.W.2d 167, 173 (Minn. 1965)) (other citation omitted).

admitted two video recordings and two photographs that law enforcement had discovered on Yusuf's phone. The photographs and videos were not extractions from Yusuf's phone, but were recordings of Yusuf's phone screen that were captured while the videos and photographs were displayed. The following is a summary of the evidence adduced at trial, which is presented in the light most favorable to the jury's verdict.

### *Relevant Trial Evidence*

The incident underlying the charges occurred while Yusuf helped S.A. look for his lost phone. Yusuf had helped S.A. look for his phone on multiple days and picked S.A. up at his house. On the second day of looking for S.A.'s phone, Yusuf found the phone in the snow. Yusuf attempted to unlock the phone, but S.A.'s cellular service provider had placed a lock on the lost phone so even S.A. could not unlock the phone. Yusuf then pulled a gun, cocked it at S.A., and told S.A. to "give [him] the phone." Yusuf took the phone in the snow and a second phone that S.A. had in his pocket, walked back to his car, and drove away. S.A. described the gun that Yusuf used in the robbery as having "a threaded barrel" with "a scope at the top" and recalled that the bottom of the barrel was brown.

While S.A. testified about his recollection of the underlying incident, the state introduced four *Spreigl* exhibits that were dated January 5 and 14. The state then showed S.A. a video that was taken of Yusuf's phone. The video depicts Yusuf's phone playing a video in which an individual can be seen with a gun in their lap. The individual is wearing grey sweatpants and a grey sweater with green designs. S.A. confirmed that the gun in the video was the same gun that Yusuf had used to rob him. S.A. was then shown another video that was taken of Yusuf's phone. Like the first video, it was a recording of Yusuf's phone

3

playing a video in which an individual can be seen with a gun in their lap. The individual in the video appears to be wearing the same clothing but has black gloves on while handling the gun. S.A. confirmed once again that he recognized the gun in the video because it was the same gun that Yusuf had used to rob him. Lastly, two photographs taken from Yusuf's phone were shown to S.A. The first image was a photograph of a gun being held and the second was a photograph of Yusuf, wearing clothes similar to those worn by the individual holding the gun in the recordings and the photograph. S.A. identified the gun in the photograph as the same one that Yusuf used to rob him, and he identified the individual in the other photograph as Yusuf.

S.A. further explained that he could not recall what Yusuf was wearing when he robbed him, but could recall that he was wearing black "Air Force 1s." S.A. also recalled that he had identified Yusuf at a show-up procedure and told the officers that Yusuf was wearing the same clothes that he was wearing during the robbery.

During S.A.'s testimony, the district court did not give any cautionary instruction regarding the *Spreigl* exhibits that had been introduced.

Next, three other witnesses testified about the *Spreigl* exhibits and how the exhibits were obtained and created. First, an officer who arrested Yusuf testified that he found a cell phone on Yusuf's person at the time of the arrest and placed it into evidence.

A crime intelligence analyst for law enforcement testified that he used "Cellebrite" programs to extract data from the phone and generate a report. This report was then given to investigators and the report was admitted into evidence.

4

Finally, an investigator for law enforcement testified that the cell phone taken from Yusuf remained in a secured locker, and after a search warrant had been obtained, he searched the contents of the cell phone. When the investigator was asked how he recognized "Exhibit 018," he recalled that he recognized it from his initial investigation of the phone. The investigator testified that upon reviewing the photo gallery "a memory section popped up with a series of videos." This video was not recorded within the time-frame specified by the search warrant, so the investigator obtained an additional search warrant and found the video in the photo library of the cell phone.

When the investigator was asked who was in the video, he responded: "Yep, this is me with . . . Yusuf's cellphone and I'm recording a video with my work cellphone of what I'm viewing from his cellphone." The investigator further testified that he could not say for certain that the photographs and videos depicted a real firearm, but he testified that the videos depicted an instrument that had characteristics that were consistent with a firearm. The investigator last testified that he was familiar with the remaining exhibits that were admitted through S.A.'s testimony.

Several other exhibits were admitted that were created during the investigation of the underlying incident. First, surveillance video from the day of the incident showed S.A. entering a vehicle that was parked in front of his residence. The license plate on the car led to Yusuf's residence. Second, Yusuf wore "dark-colored Air Force 1s" at the time of his arrest. Third, the day after the underlying incident, law enforcement officers observed multiple sets of footprints at the crime scene. The tread marks found in the footprints were consistent with the tread pattern on the Air Force 1s that Yusuf was wearing when he was

arrested. Lastly, in a recorded phone call from jail, Yusuf admitted he had driven S.A. to help him search for his phone.

### *Jury Instructions, Verdict, and Sentencing*

During the district court's final charge to the jury, the court gave the following limiting instruction:

> You have seen video evidence of alleged conduct by the defendant dated January 5th. It was admitted for the limited purpose of assisting you in determining whether the defendant committed those acts with which the defendant is charged in the complaint. This evidence is not to be used to prove the character of the defendant or that the defendant acted in conformity with such character. The defendant is not being tried for and may not be convicted of any offense other than the charged offenses. You are not to convict the defendant on the basis of any occurrence on a separate occasion. To do so might result in unjust double punishment.

The jury returned guilty verdicts on all counts. At the sentencing hearing, the district court entered conviction on the first count but did not adjudicate sentencing on the remaining counts. The district court sentenced Yusuf on the first-degree robbery and sentenced him to 75 months in prison.

Yusuf appeals.

## DECISION

I. **The district court did not plainly err when it did not provide a sua sponte cautionary instruction when *Spreigl* evidence was admitted.**

Yusuf asserts that "[t]he district court committed plain prejudicial error by failing to provide a cautionary *Spreigl* instruction" when the photographs and videos were admitted. We do not agree and conclude that the district court did not commit plain error.

6

Yusuf concedes that he did not request a limiting instruction or otherwise object. Accordingly, the parties agree that we review Yusuf's challenge for plain error. *See State v. Zinski*, 927 N.W.2d 272, 275 (Minn. 2019) (citing *State v. Goodloe*, 718 N.W.2d 413, 422 (Minn. 2006) ("Failure to request specific jury instructions or to object to instructions given generally results in forfeiture of the issue on appeal.")). "A defendant is entitled to relief from a plain error if (1) there was an error, (2) the error was plain, and (3) the error affected the defendant's substantial rights." *State v. Vasquez*, 912 N.W.2d 642, 650 (Minn. 2018) (quotation omitted). "If the three prongs of the plain error test are met, [appellate courts] then consider whether we should address the error to ensure fairness and the integrity of the judicial proceedings." *Id.* (quotations omitted). "Under the plain error rule, if [an appellate court] find[s] that any one of the requirements is not satisfied, [it] need not address any of the others." *State v. Lilienthal*, 889 N.W.2d 780, 785 (Minn. 2017) (quotation omitted). Both parties agree that a plain error review is correct.

Turning to the first prong of the plain error test, Yusuf asserts that the district court erred when it did not sua sponte give limiting instruction upon admission of *Spreigl* evidence. The district court only gave limiting instructions during the final charge to the jury. Indeed, the Minnesota Supreme Court has stated that district courts "should, sua sponte, give an unequivocal limiting instruction both at the time the evidence is admitted and at the close of trial" but the supreme court has also stated that "in the absence of a request, the district court's failure to do so [is] not reversible error." *State v. Taylor*, 869 N.W.2d 1, 18 (Minn. 2015) (quotations omitted). Therefore, the district court did not

plainly err. *Id.* (reasoning that "the district court did not err, much less plainly err" because "*Spreigl* cases do not require a limiting instruction to be given sua sponte").

As for the case Yusuf relies on to assert that the district court plainly erred, *State v. Vick*, 632 N.W.2d 676, 685 (Minn. 2001), Yusuf asserts that unlike in *Vick*, the district court here had notice of the *Spreigl* evidence. Yusuf maintains that it should have been "clear and obvious to [the] district court that when admitting prior [*Spreigl*] evidence that the state intend[ed] to use to prove its case, contemporaneous cautionary instructions [were] essential to protect [Yusuf's] right to a fair trial." But the supreme court has established that a district court's failure to provide cautionary instructions sua sponte is not plain error. *Taylor*, 869 N.W.2d at 18. Moreover, appellate courts "are not compelled to depart from the rule that a trial court's failure to sua sponte strike unnoticed *Spreigl* evidence or provide a cautionary instruction is not ordinarily plain error." *Vick*, 632 N.W.2d at 685. Therefore, we do not find *Vick* persuasive.

Because Yusuf has not established plain error—the first two prongs of the plain-error doctrine—we "need not address any of the others." *Lilienthal*, 889 N.W.2d at 785 (quotation omitted). We conclude that the district court did not plainly err when it did not provide a sua sponte cautionary instruction when *Spreigl* evidence was admitted. We reiterate, however, that the district court should have given limiting instruction at both the time the *Spreigl* evidence was admitted and at the close of trial as that is typically best practice. *See Taylor*, 869 N.W.2d at 18.

8

Even if we accepted Yusuf's argument and concluded that the district court's failure to provide a sua sponte cautionary instruction when *Spreigl* evidence was admitted was error, the error did not affect Yusuf's substantial rights. Yusuf has the burden of showing a reasonable likelihood that the alleged error significantly affected the jury's verdict. *Vasquez*, 912 N.W.2d at 650.

Although harmless error and plain error are different, the substantial-rights prong of the plain-error standard "is the equivalent of a harmless error analysis." *State v. Matthews*, 800 N.W.2d 629, 634 (Minn. 2011). To determine whether the error significantly affected the verdict, we consider non-exclusive factors, including "the manner in which the evidence was presented, its persuasive value, its use in closing argument, and [the defendant's] counter of the evidence." *State v. Bigbear*, 10 N.W.3d 48, 56 (Minn. 2024). We also consider strong evidence of guilt because "[s]trong evidence of guilt undermines the persuasive value of wrongly admitted evidence." *Id.* at 59 (quotation omitted). As highlighted by the state, the evidence of guilt presented at trial was strong. S.A.'s testimony was corroborated by surveillance video of Yusuf's car at S.A.'s home before the underlying incident and his testimony was corroborated that Yusuf wore black "Nike Air Force 1s." The state also presented evidence of shoe prints in the snow at the crime scene and the tread marks matched the shoes that Yusuf wore when he was taken into custody. Lastly, in recorded phone calls from jail, Yusuf admitted he had picked S.A. up so that S.A. could search for his phone.

Therefore, we conclude that there is no reasonable likelihood that the district court's failure to provide a sua sponte cautionary instruction when the *Spreigl* evidence was admitted influenced the verdict.

**II.     The district court did not plainly err by admitting the photo and video *Spreigl* evidence because the state provided proper authentication.**

Yusuf also contends that "[t]he district court committed plain prejudicial error by "admitting the video and photographic *Spreigl* evidence without the state authenticating the evidence." We do not agree and conclude that the *Spreigl* evidence was sufficiently authenticated.

Appellate courts review claims of unobjected-to evidentiary error under the plain-error doctrine. *State v. Martens*, 18 N.W.3d 752, 757 (Minn. 2025). "Under the plain-error doctrine, the appellant must establish (1) an error, (2) that is plain, and (3) that affects the appellant's substantial rights." *Id.* (quotation omitted). "If these three requirements are met, [an appellate court] may correct the error *only* when it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quotation omitted). "An error is plain if it 'contravenes case law, a rule, or a standard of conduct.'" *State v. Simion*, 745 N.W.2d 830, 843 (Minn. 2008) (quoting *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006)). Both parties once again agree that plain error applies.

Exhibits are authenticated at trial if the "evidence [is] sufficient to support a finding that the matter in question is what its proponent claims." Minn. R. Evid. 901(a). There are two methods to authenticate a video:  (1) the pictorial-witness theory and (2) the silent-witness theory. *In re Welfare of S.A.M.*, 570 N.W.2d 162, 164-66 (Minn. App. 1997); *see*

Minn. R. Evid. 901(b)(1), (9). Under the pictorial-witness theory, a video is authenticated by a witness who observed the events depicted on the video. *S.A.M.*, 570 N.W.2d at 164. Under the silent-witness theory, a proponent offers evidence of the reliability of the process by which the video was made. *Id.* at 165. Authentication may occur when a witness testifies to their knowledge "that a matter is what it is claimed to be." Minn. R. Evid. 901(b)(1).

Yusuf contends that the state did not authenticate its exhibits under the methods required in *S.A.M.* 570 N.W.2d at 66. In *S.A.M.*, this court reviewed the admissibility of a surveillance video from a bus. *Id.* at 163. The state offered the testimony of a video technician, who explained how the video was made, stated that the video produced an accurate result, and provided some evidence on the chain of custody. *Id.* at 166. This court concluded: "The videotape was properly admitted because it was authenticated according to a method listed in 901(b) and consistent with the broad guideline for authentication set out in [r]ule 901(a): that is, evidence was produced showing that the tape is what its proponent claimed." *Id.* at 166-67. This court held that:

> A videotape may be authenticated by testimony describing the reliability of the process or system that created the tape, as well as by testimony from an observer that the videotape is an accurate portrayal of the event, if the evidence sufficiently demonstrates that the videotape is what its proponent claims.

*Id.* at 166.

We conclude that the exhibits were sufficiently authenticated through witness testimony and consistent with the procedure set out in *S.A.M.* because the testimony established: "(1) how the video was made, (2) that it produces an accurate result, and (3) some evidence on the chain of custody." *Id.* at 166. Yusuf's argument that "there was

no testimony of any kind to authenticate the videos and photographs of Yusuf's prior act of gun possession" is unavailing. The investigator did not testify that he had personal knowledge of the possession of the firearm shown in the images stored in Yusuf's cell phone, rather he "describe[d] the reliability of the process or system that created the [exhibits]. *Id.* at 166. When the investigator was asked who was in the video, he responded: "Yep, this is me with . . . Yusuf's cellphone and I'm recording a video with my work cellphone of what I'm viewing from his cellphone." The arresting officer and crime intelligence analyst established the chain of custody for Yusuf's cell phone and the content on his cell phone's gallery. Therefore, the state provided proper authentication of the exhibits.

But more specifically, Yusuf asserts that "there was no testimony of any kind to authenticate the videos and photographs of Yusuf's prior act of gun possession." Yusuf appears to be conflating the videos and photographs found on his phone with the videos and photographs the investigator took himself. The investigator also never testified about whether the individual in the exhibits with the gun was Yusuf. In addition, S.A. never testified that the individual in the exhibits was Yusuf; he testified he was familiar with the gun in the exhibits because it looked like the same one that Yusuf had used to rob him.

Yusuf has not identified any precedential authority holding that a district court plainly and prejudicially errs by admitting unobjected-to exhibits or requiring a differing authentication procedure for videos and photographs. Because Yusuf has not established plain error—the first two prongs of the plain-error doctrine—we "need not address any of the others." *Lilienthal*, 889 N.W.2d at 785 (quotation omitted). Therefore, we conclude that

any error by the district court in admitting the photo and video evidence through witness testimony was not plain error because the authentication procedure used was consistent with *S.A.M.* 570 N.W.2d at 166-67.

**Affirmed.**